WILLIAM B. CUSACK AND EILEEN M. CUSACK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1041–65. Filed May 15, 1967.

*Jerry H. Robinson* and *Julian N. Stern*, for the petitioners.
*Harry M. Asch*, for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in income tax in the amount of $41,163.24 for 1959 and $155.60 for 1962. The deficiency for 1962 is conceded, as well as certain adjustments for 1959. The sole issue remaining for decision is whether petitioners, who realized gain from the involuntary conversion of property by condemnation, made a timely purchase of other property similar or related in service or use to the converted property so that the gain is subject to nonrecognition pursuant to section 1033 of the Internal Revenue Code of 1954.

FINDINGS OF FACT

The stipulation of facts and exhibits attached thereto are incorporated herein.

Petitioners are husband and wife residing in Los Altos, Calif. They filed a joint Federal income tax return for the calendar year 1959 with the district director of internal revenue at San Francisco, Calif.

In 1958 the petitioners were owners of a parcel of property in Los Altos herein referred to as parcel 8, consisting of 8.06 acres of land. Their residence was situated on 3 acres of this land and three rental properties stood on the remaining 5-plus acres. The petitioners also had an undivided 47.1-percent interest in 64.585 acres of unimproved land, also in Los Altos, herein referred to as parcels 1 through 7.

During 1958 the Foothill Junior College District of Santa Clara County instituted condemnation proceedings against parcels 1 through 7, and against parcel 8. On March 17, 1959, a Final Decree and Order was entered, condemning parcels 1 through 8. The petitioners' adjusted basis for gain or loss and the net proceeds received for each of the properties condemned are as follows:

| Property | Adjusted basis | Net proceeds |
|---|---|---|
| Parcels 1 through 7 | $94, 177. 50 | $206, 372. 42 |
| Parcel 8—residence and 3 acres of land | 58, 229. 91 | 130, 000. 00 |
| Rental properties and 5 acres of land | 31, 390. 23 | |
| Totals | 183, 797. 64 | 336, 372. 42 |

The net proceeds in the total amount of $336,372.42, received by the petitioners, constitutes the "amount realized" as that term is used in section 1033(a)(3)(A) of the Internal Revenue Code of 1954. In the absence of an application for extension of time, the period within which a replacement purchase under section 1033(a)(3) of the Internal Revenue Code of 1954 was to be made, ended on December 31, 1960. The petitioners did not apply for such an extension of time.

In July 1959 the petitioners purchased unimproved real property located in Los Altos, Calif., and proceeded to construct a residence thereon. The total cost of the land and the constructed improvements was $106,565.60. During 1960 the petitioners purchased, for purposes of investment, three separate rental properties located in Mountain View, Calif., for an aggregate purchase price of $57,450. Also in 1960, the petitioners purchased an apartment building in Palo Alto, Calif., at a cost of $45,500. All of the foregoing amounts represented purchases made within the time period specified for nonrecognition of gain under section 1033. These purchases were intended by the petitioners to constitute reinvestment of their condemnation proceeds for purposes of the postponement of recognized gain.

Palo Alto Investment Co., hereinafter sometimes called Palo Alto, is a California partnership engaged in the real estate business, which business includes investment activities and subdivision and sale of lots. The petitioners were unrelated to any of the partners or employees of Palo Alto.

In 1957 Palo Alto purchased 200 acres of unimproved land situated in Placer and El Dorado Counties, California. This land was known generally as the McKinney Estates. In January 1960 Palo Alto purchased an additional 65 acres of land adjacent to the McKinney Estates, which acreage was a portion of the property known as Kailua Park. This 65 acres shall hereinafter be referred to as the Tahoe property. The purchase price paid by Palo Alto for the Tahoe property was $97,964.02. The Tahoe property, when purchased by Palo Alto,

was unimproved property situated in El Dorado County. At the time of its purchase, it was in need of an access road and a source of water.

Petitioner William B. Cusack has been in the real estate business for more than 20 years. He is a licensed real estate broker and a licensed general contractor. He made a 200-mile trip to investigate the Tahoe property as a potential investment. He considered the value of the property as a subdivision. Palo Alto was developing adjacent property as a subdivision. Petitioner found that the Tahoe property would be valuable if an access road and water supply were available. These could be furnished only across the adjacent property owned by Palo Alto. He was shown a map of the proposed subdivision of the Palo Alto tract which indicated that roads and waterlines were planned which would reach the western line of the Tahoe property.

On December 21, 1960, the petitioners and Palo Alto executed a "Deed and Agreement of Sale." This document was recorded in the official records of El Dorado County on December 22, 1960. The property which was the subject of the document was the Tahoe property. At the time of execution Palo Alto was the record owner in fee simple of the Tahoe property. Palo Alto made no change in its record ownership prior to the recordation of the document. This transaction was intended by the petitioners to constitute a reinvestment of their condemnation proceeds for the purpose of postponement of recognized gain.

The "Deed and Agreement of Sale" provided:

DEED AND AGREEMENT OF SALE

PALO ALTO INVESTMENT CO., a co-partnership, hereinafter called Seller, GRANTS to WILLIAM B. CUSACK and EILEEN M. CUSACK, husband and wife, hereinafter called Buyer on the terms and conditions hereinafter set forth, the following described real property, situated in the County of El Dorado, State of California, described as follows:

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

TOGETHER with easements and rights-of-way applicable to the entire said "KAILUA PARK" property.

1. PURCHASE PRICE. As and for the purchase price of the above described property, Buyer agrees to pay to Seller the sum of One Hundred Ninety Five Thousand Eight Hundred Seventy Nine Dollars ($195,879.00) as follows:

The sum of Five Thousand Dollars ($5,000.00) upon execution of this agreement, receipt of which is hereby acknowledged by Seller, and the balance on or before the 1st day of July, 1961. The remaining balance of $190,879 to bear interest at the rate of Six & One Half Percent (6½%) per annum payable on July 1, 1961.

2. EXPENSES OF SELLER. Buyer agrees to pay all actual and reasonable expenses for escrow fees, recording fees, accounting fees, and legal fees incurred in connection with the sale of the above described real property.

3. TITLE. Seller agrees, upon receipt of the purchase price in full as set forth above, to furnish a policy of title insurance, showing title to be vested in Buyer,

free and clear of all liens except liens for taxes not then delinquent and such liens as have been placed thereon by buyer.

4. SPECIAL PROVISIONS TO RECONVEY. In the event either:

(a) public water service has not been extended by sellers to the west boundary of the above described property not later than July 1, 1961, or

(b) there has not been constructed by the sellers by July 1, 1961, an all weather accessible right of way road extending to the west boundary of said property which connects with other existing streets dedicated to public use, all of which will afford unrestricted access to the said property,

then and in either event, Buyer shall have the option to reconvey the above described property to seller, free and clear of all liens placed thereon by Buyer, not later than July 15, 1961. In the event Buyer reconveys said property as herein provided, Seller will refund to Buyer all sums theretofore paid by Buyer to Seller on account of purchase price, not, however, including any sums paid by Buyer as and for expenses as provided by paragraph 2.

Buyers hereby GRANT Power of Attorney to Sellers for the sole purpose of acting in their behalf on any petitions, documents or proposals necessary to the formation of the McKINNEY WATER DISTRICT. The Sellers may not obligate the Buyers to any financial responsibilities or liabilities by virtue of this authority.

5. SUCCESSORS AND ASSIGNS. This agreement shall be binding on and inure to the benefit of the heirs, legatees, successors, and assigns of both parties.

The $195,879, as set forth in the "Deed and Agreement of Sale," was considered by the parties thereto to be a fair and reasonable price, provided that an access road and water service were provided.

Contemporaneous with the execution of the "Deed and Agreement of Sale," the petitioners paid to Palo Alto, in accordance with paragraph 1 of that document, the sum of $5,000. Also contemporaneous with the execution of the "Deed and Agreement of Sale," the petitioners executed a standard form deed of trust. This deed of trust was recorded in the official records of El Dorado County on December 22, 1960. California Pacific Title Insurance Co. was a California corporation entirely unrelated to the petitioners or to Palo Alto, and was licensed under the laws of the State of California to serve in the capacity of trustee under deeds of trust.

The deed of trust between petitioners, as trustors, California Pacific Title Insurance Co., as trustee, and Palo Alto, as beneficiary, provided that trustor irrevocably grants, transfers, and assigns to the trustee in trust with power of sale, the described property, the Tahoe property, for the purpose of securing payment of the indebtedness in the amount of $195,879.

Petitioners also, on December 21, 1960, gave Palo Alto a power of attorney to represent them in the formation of a water district involving the Tahoe property.

The Tahoe Title Guaranty Co. issued a document entitled "Preliminary Report," dated December 30, 1960, which stated that examination of the records of the Office of the Recorder of El Dorado County disclosed that title to the Tahoe property was at 8 a.m. on December 23,

1960, vested in the petitioners, subject to various taxes and conditions including those of the "Deed and Agreement of Sale" described above, and the deed of trust described above.

Palo Alto sponsored the formation of the McKinney Water District. On October 17, 1960, the Board of Supervisors of El Dorado County denied the McKinney Water District's petition for incorporation in that county on the ground that El Dorado County did not want more than one-half of the district's property situated in that county. On December 14, 1960, the Placer County Board of Supervisors, in a letter directed to the El Dorado County Board of Supervisors, stated that it had gone on record as opposing the establishment in Placer County of the McKinney Water District as then proposed.

On January 3, 1961, at the instance of Palo Alto, a petition was filed with the Placer County Board of Supervisors for incorporation in that county of the McKinney Water District. The real property that constituted the area to be serviced by the water district was McKinney Estates, which was partly in Placer County and partly in El Dorado County and was adjacent to, and met, the west boundary of the Tahoe property, which was in El Dorado County. On April 11, 1961, the Placer County Board of Supervisors by resolution ordered the formation of the McKinney Water District in accordance with the petition.

On May 29, 1961, Cusack wrote Palo Alto, asking for information relative to the conditions of performance required of Palo Alto under paragraph 4 of the agreement. Palo Alto replied that their plans had to be altered and they would not be able to comply with the requirements of the agreement.

In accordance with the option to reconvey contained in the "Deed and Agreement of Sale," the petitioners and Palo Alto executed on October 9, 1961, a mutual release. This provided for reconveyance of the property by petitioners to Palo Alto and return to petitioners of the $5,000 previously paid, reduced by the expenses chargeable to the petitioners, also a mutual release by each party to the other of any and all claims arising out of the "Deed and Agreement of Sale" dated December 21, 1960. Petitioners executed a grant deed of the Tahoe property to Palo Alto, which was recorded on October 11, 1961. California Pacific Title Insurance Co., as trustee, executed a "Deed of Reconveyance" stating that the indebtedness secured by the deed of trust had been fully paid. This document was also recorded on October 11, 1961. The trustee charged taxes of $364, premium of $494 for a title insurance policy, and expenses of $107.20 against the $5,000 initial payment made by the petitioners.

Palo Alto recorded the transaction of December 22, 1960, on its books as follows:

|                                     | Dr.        | Cr.        |
|-------------------------------------|-----------|-----------|
| Contract receivable                 | $195, 879 |           |
| Land (65 acre Tahoe parcel)         |           | $97, 964. 02 |
| Deferred income                     |           | 97, 914. 98 |

To record sale of 65 acre parcel of timberland in El Dorado County per Cal-Pac. escrow

Number PA 30113 and recording of deed and agreement on 12/22/60.

These entries were reversed by an entry dated October 31, 1961, which explained: "To record rescission of sale of 12–22–60 for failure to fulfill certain conditions required timely, per Cal-Pac. escrow 32057—Deed recorded 12–11–61."

Petitioners, in their joint return for 1960, elected to avail themselves of the nonrecognition provisions of section 1033 of the 1954 Code with regard to the entire amount of the condemnation proceeds received in 1959. In their 1960 return they stated:

In 1959 taxpayers were subjected to condemnation of real estate owned by them at Los Altos, California. The properties were partly unimproved and partly residential and were contiguous. The amounts received as the result of condemnation judgments were $130,000.00 for one property and $206,372.42 for the other, or a total of $336,372.42. No taxable gain was reported therefrom, as it constituted an involuntary conversion. The Proceeds of the condemnation were applied to other properties, consisting of the following (with purchase costs shown):

| | | |
|---|---|---|
| (1) Property at 11874 Country Club Drive—lot | $14, 000. 00 | |
| Cost of construction of residence thereon, without overhead from Royal Corp | 78, 386. 60 | |
| Additional amounts paid, applied as overhead on construction ($6,625.00 plus $3,633.00) | 10, 258. 00 | |
| Additional costs paid by taxpayer | 3, 921. 00 | $106, 565. 60 |
| | | |
| (2) 3 dwellings at Mountain View, Calif.— | | |
| 830 Tulane Drive | 18, 950. 00 | |
| 871 Tulane Drive | 19, 000. 00 | |
| 877 Tulane Drive | 19, 500. 00 | 57, 450. 00 |
| | | |
| (3) 65 acres at Lake Tahoe in El Dorado County, California, Kailua Park | | 195, 879. 00 |
| | | |
| Total amount of reinvestment | | 359, 894. 60 |

(The reinvestment is in excess of the condemnation proceeds, and the excess constitutes additional investment.)

Taxpayer had not disposed of any of the foregoing properties.

Petitioners purchased the Tahoe property in December 1960. This was a timely purchase of property similar or related in service or use to the property involuntarily converted in 1959.

OPINION

The petitioners were owners of residential and investment properties which were seized through condemnation proceedings by public

authority. They made certain reinvestments of the proceeds in a new residence and in new investment properties. They contend that the entire proceeds were timely invested through purchases of property similar or related in service or use to the property condemned, within the meaning of section 1033 [1] of the Internal Revenue Code of 1954, so that the gain realized from the involuntary conversion of their former properties is subject to nonrecognition.

Respondent concedes that the acquisition of a new residence and certain of the other properties qualifies under section 1033, but contends that the transaction relative to the Tahoe property does not qualify.

Respondent's position is that the "Deed and Agreement of Sale" dated December 21, 1960, when interpreted by California law is an unexecuted contract of sale and not a conveyance by reason of the failure to fulfill the essential conditions of both a road and a water supply on which consideration of the purchase price term was dependent and contingent. Respondent says that consequently the execution of that document by petitioners as buyers does not amount to a purchase as required by section 1033.

Petitioners contend that under the "Deed and Agreement of Sale" dated December 21, 1960, and recorded the next day, the petitioners purchased the Tahoe property within the meaning of section 1033.

[1] SEC. 1033. INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

(1) CONVERSION INTO SIMILAR PROPERTY.—Into property similar or related in service or use to the property so converted, no gain shall be recognized.

\* \* \* \* \* \* \*

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

(A) NONRECOGNITION OF GAIN.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. \* \* \*

\* \* \* \* \* \* \*

(B) PERIOD WITHIN WHICH PROPERTY MUST BE REPLACED.—The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending—

(i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or

(ii) subject to such terms and conditions as may be specified by the Secretary or his delegate, at the close of such later date as the Secretary or his delegate may designate on application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe.

Respondent does not dispute that the Tahoe property was similar or related in service or use to the property converted, nor that the purchase, if it was a purchase, was timely under section 1033.

Section 1033 is a relief provision enacted to allow a taxpayer to replace property involuntarily converted without paying the capital gains tax incident to other exchanges of property. In the case of property involuntarily converted into money after December 31, 1950, if the taxpayer, within a specified period, for the purpose of replacing the converted property, purchases property similar or related in service or use to the converted property, or purchases stock in the acquisition of control of a corporation owning such property, gain is recognized, at the taxpayer's election, only to the extent that the money received exceeds the cost of the property or stock. As a relief provision, this section is to be construed liberally to achieve its purpose. *John Richard Corp.*, 46 T.C. 41; *Harvey J. Johnson*, 43 T.C. 736; *Filippini v. United States*, 318 F. 2d 841 (C.A. 9, 1963) ; *Gaynor News Co.*, 22 T.C. 1172.

We agree with petitioners that they purchased the Tahoe property.

Respondent contends that the document is ineffective as a transfer, saying that the only language of conveyance is the use of the word "grants" in the introductory paragraph, and that even that term is subject to "terms and conditions hereinafter set forth." Respondent says that a true deed would be signed only by the grantors, while this instrument bears the signatures of the purported buyers, indicating that it is something other than a deed. Respondent further contends that the petitioners were not desirous of acquiring the property unless the access road and water supply were provided and that payment of the purchase price was conditioned upon the furnishing of these necessary services. Also, paragraph 3, providing that petitioners were to receive a title insurance policy only upon payment of the full purchase price, and paragraph 5, providing that the agreement shall be binding on the heirs or assigns of both parties, are conditions not usually present in any true deed. Respondent considers this document an executory contract only, not sufficient to vest petitioners with title or the rights of ownership of the land.

The "Deed and Agreement of Sale" provided: "PALO ALTO * * * Grants to WILLIAM B. CUSACK and EILEEN M. CUSACK * * * the following described real property * * *."

Under California law the word "grants" is all that is necessary to convey title. California Civil Code sec. 1092.[2] It is stipulated that

---

[2] * * * A grant of an estate in real property may be made in substance as follows:

"I, A B, grant to C D all that real property situated in (insert name of county) County, State of California, bounded (or described) as follows: (here insert description, or if the land sought to be conveyed has a descriptive name, it may be described by the name, as for instance, 'The Norris Ranch.')

"Witness my hand this (insert day) day of (insert month), 18———,

                                                          "A B."

Palo Alto was record owner of the property just prior to the recording of this document. After the recordation the Tahoe Title Guaranty Co. reported that title was vested in the petitioners.

The document involved performs several functions. In addition to the conveyance it includes a power of attorney given by the buyers to the seller to act for them in the formation of a water district. The purpose of this was to aid in making the water supply available. The buyers' signatures were necessary on this account. The document also included an option.

The payment of the major part of the purchase price was not *conditioned* upon the furnishing of an access road and a water supply, as respondent contends. Under the agreement petitioners could pay the balance due in full if they chose, even if these services were not provided. If these services were not available by the date specified they had the *option* to reconvey the property to Palo Alto. They chose to exercise this option.

The petitioners had no need of a title insurance policy until they committed the balance of the purchase price of their investment. The omission to provide it immediately is not important as long as the sellers agreed to provide it eventually. A premium for title insurance was one of the expenses charged to the petitioners in the settlement of the account in 1961.

Respondent also contends that even if title passed to petitioners, the burdens and benefits of ownership of the property had not passed to them and there was not a completed transaction resulting in a purchase for purposes of section 1033. We do not agree.

One of the burdens of ownership was the payment of real property taxes when they became due. This burden was discharged by the trustee under the deed of trust who thereupon charged petitioner with the amount of the taxes. The only other burden imposed upon petitioner as the result of the purchase of the property in question was the contractual obligation to pay to the seller the full amount of the purchase price. This could be met in either of two ways. Petitioners could pay the full amount and retain ownership whether or not an access road and water supply was made available, or, if an access road and water supply were not made available, they had the choice of reconveying the property to the sellers. The fact that they subsequently chose to reconvey the property to the sellers did not prevent the sale from being a completed transaction.

Petitioners had the right of possession immediately upon execution and delivery of the deed. This right was not conditioned upon the availability of an access road or water supply. These were conditions which might affect the use they might make of the property but not their right of possession. If not met within the prescribed time they

merely gave petitioners the right to reconvey the property to the sellers. Petitioners were *not required* to reconvey if these conditions were not met. They had acquired the property as an investment and if they so chose, could have held it for future appreciation in value. The fact that they did not take immediate physical possession and begin improvements is not material.

One of the benefits of ownership was the right to petition for the formation of a water district. Petitioners exercised this right through Palo Alto to which they gave a power of attorney to act for them in petitioning for the formation of a water district which would include petitioners' property.

Petitioners intended the transaction evidenced by the "Deed and Agreement of Sale" to constitute a reinvestment of the condemnation proceeds received by them. The parties hereto have so stipulated. Palo Alto considered the transaction as a sale, as evidenced by the entry on its books: "To record sale of 65 acre parcel * * *." The "Deed and Agreement of Sale," as well as the deed of trust which petitioners executed, was recorded in the county where the property was situated. When petitioners elected to exercise their option to reconvey the property it was necessary that they execute a grant deed to Palo Alto.

We hold that there was a sale of the Tahoe property to petitioners in December 1960, and that this constituted a timely purchase of property similar or related in service or use to their property involuntarily converted in 1959, within the meaning of section 1033 of the Internal Revenue Code of 1954.

*Decision will be entered under Rule 50.*