## COMMISSIONER OF INTERNAL REVENUE v. BACHRACH.

## COMMISSIONER OF INTERNAL REVENUE v. UHLMANN.

## COMMISSIONER OF INTERNAL REVENUE v. BENJAMIN.

### Nos. 10062–10064.

United States Court of Appeals
Seventh Circuit.
May 12, 1950.

Theron L. Caudle, Assistant Attorney General, Ellis N. Slack, Melva M. Graney, A. F. Prescott, Edward J. P. Zimmerman, Special Assistants to Attorney General, for petitioner.

Walter Bachrach, Morris Solomon, Chicago, Illinois, Hazel Sheffner, Chicago, Illinois, for respondents.

Before MAJOR, Chief Judge, and KERNER and DUFFY, Circuit Judges.

MAJOR, Chief Judge.

These are petitions for review of the decisions of the Tax Court and involve deficiencies in income tax for the taxable year 1944. The questions for decision are the same and stem from identical facts. They were consolidated before the Tax Court for hearing and decision.

Two issues are presented for decision: (1) whether the exchange by taxpayers of second mortgage bonds issued by the Standard Club for certificates of indebtedness pursuant to a plan of reorganization under Sec. 77B of the Bankruptcy Act, 11 U.S. C.A. § 207, constituted a "tax free" reorganization, as defined in Sec. 112(g) of the Revenue Act of 1936, 26 U.S.C.A. § 112(g), with a resultant non-recognition of gain or loss under Sec. 112(b) (3) of the same Act, and (2) whether the second mortgage bonds became worthless in 1934 so as to give the certificates of indebtedness issued therefor a cost basis of zero for the purpose of determining gain or loss in the taxable year.

The facts as found in an unpublished memorandum of the Tax Court are not in dispute. We relate them as has the Commissioner in his brief in this court. The individual taxpayers owned varying amounts of $500 Standard Club (a non-profit Illinois corporation which operated as a private club for its members) second mortgage leasehold bonds, which they had purchased at face value. The Club's principal asset was a club building, erected in 1925 upon property leased by the Club under three long-term leases.

In 1925 the Club issued $1,000,000 of first mortgage leasehold bonds and in 1927, $1,000,000 of second mortgage leasehold bonds. The funds received, together with initiation fees, went into the building and fitting of the Club building. The cost of the building was carried on the books at acquisition at $2,639,080.34, and the equipment and fixtures at $314,850.25. In 1934 the reproduction cost of the building, after deducting ordinary age depreciation, was $1,420,920.

In 1934, the Club was in default of $113,-650 with respect to the payment of rentals under the leases. It was delinquent, too,

in the payment of real estate taxes, including interest and penalties, of $100,000; of $782,000 of principal and $109,740 of matured interest on the first mortgage leasehold bonds; and of $1,000,000 of principal and interest of $125,000 on the second mortgage leasehold bonds. Its other liabilities approximated $39,000. The Club was then possessed of the building, fixtures, and furniture, as well as current assets of about $100,000. Its March 31, 1934, balance sheet showed assets of $3,130,021.-07, against liabilities aggregating $2,370,-264.62.

Being unable to meet its debts as they matured, the Club filed reorganization proceedings under Sec. 77B of the Bankruptcy Act. Its petition recited that the lessors under the ground leases were amenable to amending the leases, agreeing to reduction in ground rent, provided the Club could raise funds from contributors to meet delinquent taxes and otherwise satisfactorily recapitalize its debt structure.

The Club remained in possession of its property and operated it, pursuant to permissive orders of the Court. In 1937, the reorganization proceedings were terminated. Under the plan, the old first mortgage leasehold bonds became and were exchangeable for new fifteen-year income leasehold bonds, with interest payable at variable rates dependent on the Club income available; and the old second mortgage leasehold bonds became exchangeable for new certificates of indebtedness due and payable without interest in 1949. As part of the plan, it was provided that the certificates of indebtedness would be retired, to the extent possible, out of monies left after payment of operating expenses of the Club, including ground rentals, taxes, and the amounts allocable to the purchase of the new first mortgage bonds and interest thereon, and for sinking-fund requirements. A sum slightly exceeding $81,-000 was necessary to meet these obligations. In only one year, that ending March 31, 1944, was the income of the Club sufficient to permit the retirement of any certificates of indebtedness. Its fixed assets, as well as its equity (excess of assets over liabilities, approximately $750,000), re-

mained substantially the same from 1934 to 1946, according to the Club's books.

Although there were no bid and asked quotations on second mortgage bonds or on the certificates of indebtedness at any time between 1934 and 1946, between 1938 and 1943 holders of about $65,000 worth of certificates sold them at the rate of $2 per thousand. During 1944 on tenders pursuant to the terms of the plan of reorganization, the Club purchased $194,500 par value of such certificates at a total cost of $4,064.34, including those of the taxpayers herein.

Each taxpayer claimed a deduction in his 1944 return of a long-term capital loss of fifty per cent, based on the difference between the amount received on the sale of the certificates and the face amount of the certificates. These deductions were disallowed on the ground that the basis of the certificates was zero, being worthless prior to 1944.

■ As to the first issue, it is the contention of the Commissioner that the revision of the capital structure, contemplated by the statutory definition, is a readjustment of the stock interest and that it does not include a refinancing transaction dealing with indebtedness, as is claimed to be the situation here, wherein a new creditor's interest is substituted for his old interest.

The Tax Court in disposing of this issue stated: "We need not long be detained by the first issue, for respondent recognizes that if we follow Commissioner [of Internal Revenue] v. Neustadt's Trust, 2 Cir., 131 F.2d 528, affirming 43 B.T.A. 848, and Commissioner [of Internal Revenue] v. Estate of Edmonds, 3 Cir., 165 F.2d 715, affirming a Tax Court Memorandum Opinion, that issue must be decided adversely to him. Although respondent urges, without advancing any new arguments, that those cases were wrongly decided, we believe otherwise and shall continue to follow them in these proceedings."

The Commissioner here also concedes that the Neustadt decision by the Second Circuit and the Edmonds decision by the Third Circuit are contrary to his position,

but it is insisted that those cases were erroneously decided and should not be followed. It appears that every argument which the Commissioner advances here was made in those cases. And our study of the situation leaves us unconvinced that we should reach a different result. We therefore agree with the Tax Court in its disposition of this issue.

■ Concerning the second issue, the Tax Court stated:

"It is respondent's contention that in 1934 the second mortgage bonds became worthless when the Club filed its petition in bankruptcy, and that the certificates given in exchange therefor in 1937 were also worthless; and, therefore, they had no basis in the hands of petitioners. He argues that by the harsh terms of the lease amendments, later incorporated in the plan of reorganization, the lien of the second mortgage bondholders was extinguished, and they had no present equity. The securities had no prospective value, he maintains, because the Club income had to reach a virtually unattainable level before any portion thereof would be available for retirement of the certificates pursuant to the terms of the reorganization plan. In this argument, it is to be observed that respondent disregards the factor that any certificates not purchased or retired prior to August, 1949, were 'to be and become the general obligation' of the Club. Moreover, he minimizes the book value and reproduction value of the Club's principal assets as elements in determining the question of the worthlessness of the securities.

"Petitioners, on the other hand, have stressed the facts that according to the Club's balance sheets its assets exceeded liabilities at all times material by over ¾ of a million dollars, and that even if the building were to be valued at reproduction cost, after ordinary age depreciation, there was still an equity in the holders of the second mortgage leasehold bonds of approximately 70 cents on the dollar. Additionally, they assert that the Club at all times was a going concern, and earned substantial profits every year from March 31, 1935, to March 31, 1947."

The Tax Court concluded that the second mortgage bonds were not worthless in 1934, and that they had a present liquidating as well as a potential value. It followed, so the Tax Court concluded, that the certificates of indebtedness procured in 1937 were not worthless upon their receipt by taxpayers. In so deciding that court observed "that if petitioners had sought to claim that their bonds were worthless in 1934, respondent might well have argued that they were not, and that the deductions should have been disallowed." That this was not an idle observation is shown by the cases. More than that, the question as to when stocks or bonds become worthless is one of fact to be determined by the Tax Court and must be accepted by us if substantially supported. Morton v. Commissioner of Internal Revenue, 7 Cir., 112 F.2d 320. In our view, the finding that the second mortgage bonds did not become worthless in 1934, as claimed by the Commissioner, is not only substantially but overwhelmingly supported.

Thus we agree with the Tax Court on both issues raised by the petitioner. The decisions are therefore

Affirmed.