Bert Ruud and Emma Ruud v. Commissioner.
Ruud v. Commissioner
Docket No. 2006-64.
United States Tax Court
T.C. Memo 1969-252; 1969 Tax Ct. Memo LEXIS 45; 28 T.C.M. (CCH) 1284; T.C.M. (RIA) 69252; November 26, 1969, Filed William S. Holden, Idaho First Nat'l Bank Bldg., Idaho Falls, Idaho, for the petitioners. Gary C. Randall, for the respondent. SCOTT 1285
Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies *46 in petitioners' income taxes and additions to taxes under section 6653(a), I.R.C. 1954, [1] for the calendar years and in the amounts as follows: Year
Deficiency
Addition to tax under sec. 6653(a) I.R.C. 1954
1955
$23,397.84
$1,169.89
1956
4,140.64
207.03
1958
5,897.01
294.85
1959 1,099.58
54.98
$34,535.07
$1,726.75
By answer to amneded petition filed October 15, 1968, respondent claimed an increased deficiency for the year 1956 of $3,013.20 in tax and $150.66 in addition to tax making the total deficiency for this year $7,153.84 and the total addition to tax under section 6653(a) $357.69. [2]
Some of the issues raised by the pleadings have been disposed of by agreement of the parties leaving for our decision *47 the following: (1) The amount of gain realized by petitioners from receipts from the condemnation of their ranch and hotel properties and the amount of such gain, if any, which is not to be recognized under section 1033. (2) Whether petitioners' stock in Compressed Products Corporation became worthless in 1955 and their stock in Blind Bull Company became worthless in 1954 or 1955, and, if so, the amount of petitioners' loss from such worthlessness. (3) Whether there were debts owed to petitioner Bert Ruud by Blind Bull Coal Company from a loan of $7,055.67 and a guarantee of $3,000 paid by petitioner, [3] and if so, did these debts become worthless in 1954 or 1955? (4) Whether petitioners failed to report a profit of $7,369.94 realized by them in 1956 from the operation of the San Dee Motel. (5) Is the underpayment of tax, if any, by petitioners in each of the years here in issue due to negligence or intentional disregard of rules and regulations? Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners are *48 husband and wife who filed joint Federal income tax returns for the years 1955 through 1959 with the district director of internal revenue in Boise, Idaho, reporting their income on the cash basis. At the time of the filing of the petition in this case, petitioners resided in Boise, Idaho. Home Ranch and Alpine Properties In 1918 petitioners acquired approximately 650 acres of ranch property located in southeastern Idaho referred to as the home ranch property. It was conveyed to petitioner by George D. and Florence L. Keyser by deed dated May 22, 1918. This deed was recorded on November 12, 1919. The consideration recited in the warranty deed is the sum of $10 and other valuable consideration. The deed shows the cancellation of $20 of internal revenue stamps. In November 1919 the applicable statute required internal revenue stamps in the amount of 50 cents per $500 of purchase price. When petitioner went to record his deed, the clerk stated to him that some amount of revenue stamps should be placed on the deed and canceled. Petitioner placed the sum of $20 in stamps on the deed without knowledge of the requirement of the statute as to the amount of stamps required and without *49 reference to the actual amount of the purchase price of the property. Petitioner entered into a written contract with George D. Keyser for the purchase of the land and certain machinery and horses. Petitioner was unable to find the contract and believes it was destroyed at the time of a fire at his bank or at the time of a fire at his home. The contract did not provide for the purchase of any cattle. It is petitioner's recollection that the cost assigned to the land in the contract was over $65,000. Petitioner gave five separate checks to George D. Keyser with a notation on all except one that it was in payment on the contract. One of these checks dated May 22, 1918, was in the amount of $15,000, one dated October 4, 1918, was in the amount of $5,000, one dated October 30, 1918, was in the amount of $20,000, one dated December 28, 1918, was in the amount of $7,040.80, and one dated April 1, 1919, was in the amount of $27,247.30. The check for $7,040.80 1286 was the one which bore no notation. However, a receipt dated January 3, 1919, from G. D. Keyser/per L. Kelly given to petitioner for $7,040.80 bore the notation, "on account." Petitioner made arrangements to purchase the *50 ranch late in 1916 and began purchasing the cattle needed to stock the ranch. During the last month of 1916 and throughout 1917 he purchased over 300 head of cattle from persons other than the Keysers. The home ranch property had been purchased by the Keysers in 1914 and 1915 in three separate transactions. One purchase was of 120.15 acres for $1,500, another was of 160 acres for $2,150, and the third was of 462.37 acres for $13,000. The approximately 650 acres sold to petitioners in 1918 were the major part of the three tracts totaling approximately 742 acres which the Keysers had purchased in 1914 and 1915 for $16,650. In order to profitably operate a cattle ranch in the section of Idaho where the home ranch is located, it is necessary to have the right to use forest land for grazing. This was also the situation at the time the Keysers acquired the home ranch property and at the time they sold it to petitioner. A grazing permit is required for use of forest land for grazing. Such permits are issued in relationship to the amount of land contained in a parcel. Therefore, the value of the land greatly increases when the total area is large enough to make the owner eligible for a *51 forest grazing permit. The cost of land in Idaho which could be used for cattle grazing had substantially increased between 1915 and 1917 because of the inflation occasioned by World War I. Petitioner acquired the Alpine property which lies on the Idaho-Wyoming border near the home ranch in several parcels. Petitioner purchased 140 acres of this land from David Porter. The warranty deed dated July 15, 1920, was executed by David Porter to the petitioners for the 140 acres of land. It does not state the price of the land but shows a canceled internal revenue stamp of 50 cents. However, petitioner paid Porter $1,300 in cash for the land and assumed a mortgage to the Union Central Life Insurance Company in the amount of $800. About 4 or 5 years after his purchase from David Porter, petitioner purchased 160 acres of land from a widower named Olsen. At the time Olsen verbally agreed to sell the land to petitioner, petitioner paid him $1,250. Later, petitioner paid an additional $500 to Olsen who at the time was going to the East for the funeral of one of his parents. The verbal agreement was that Olsen was to return and give petitioner a deed to the land. Petitioner took possession *52 of the land but Olsen never returned to give him a deed to the property. Bonneville County, Idaho advertised the property for sale for unpaid taxes of $80. Petitioner paid the $80 and received a tax deed to the property. Shortly thereafter petitioner paid Jennie Reese $1,250 for a small parcel of land allowing her to remove the building thereon. Petitioner also paid R. L. Bixby $1,800 for 1 1/2 acres. The Alpine property was composed of these various tracts which cost petitioner a total of $6,980. Fires during the 1940's destroyed petitioners' home and the Largilliere Company Bank in which petitioner had always had an account and kept a safety deposit box. Most of his records were destroyed either in the bank fire or in the fire at petitioner's home. During the years 1942 and 1944 the home ranch was subject to several floods which destroyed a number of the buildings as well as fencing. In the years 1944 and 1945 petitioners made substantial improvements on their ranch property. They overhauled the farm buildings, installing sidings and improving the roofs. The woodshed, milkhouse, and miscellaneous improvements including a water well, barns, and extensive fencing were built at *53 approximately the same time. Improvements were made during the time the home ranch and Alpine property were held by petitioner which have the following bases to petitioners: Alpine hotel (net of depreciation)
$ 7,500
House on ranch
15,000
Granaries (net of depreciation)
7,912
Miscellaneous capital improvements
29,700
In 1955 the United States Government began condemnation proceedings against the home ranch and Alpine properties in order to obtain the rights to such property prior to its flooding by the Palisades Dam. On February 12, 1955, the declaration of taking was filed by the Government covering the two properties which consisted of approximately 1,000 acres. In connection with the declaration of taking, a check in the amount of $152,250 was deposited with the Clerk 1287 of the United States District Court, District of Idaho, and made subject to withdrawal of petitioners. At that time title to the property passed to the United States. The petitioners contested the amount of the award in the United States District Court for the District of Idaho, and were granted an additional award of $20,120.65 on December 15, 1955. This additional award was paid *54 to the clerk of the court on January 12, 1956. It was made subject to withdrawal by petitioners at that time. The $152,250 sum was disbursed to petitioners on January 3, 1956. The sum of $20,120.85 [4] was paid by check to petitioners on January 14, 1956. However, petitioners did not cash the check which was subsequently canceled. A replacement check was issued, but not cashed until sometime subsequent to 1964. No gain from the disposition of their home ranch and Alpine properties was reported by petitioners on their joint Federal income tax returns for any of the years 1955 through 1959. The $152,250 made available to petitioners in 1955 as a result of the condemnation proceedings is allocable to petitioner's properties as follows: Land exclusive of home
$ 98,507
Farm home (home ranch)
28,795
Alpine hotel
15,155
Granaries 9,093
Total
$151,550
Plus attorney fees 700 $152,250 The $20,127 made available to petitioners in 1956 as a result of the condemnation proceedings is allocable to petitioners' properties as follows: *55 Property
Salesprices
Allowableexpenses
Sales priceless expense
Land exclusive of home
$13,080
$1,161
$11,919
Farm home (home ranch)
3,825
341
3,484
Alpine hotel
2,005
171
1,834
Granaries 1,217
117
1,100
Total $20,127
$1,790
$18,337 During the summer of 1956 petitioner and his family moved into the living quarters provided for the operator of the San Dee Motel located in Idaho Falls, Idaho. Petitioners agreed to buy the San Dee Motel for a total price of $155,000 and made payments of $36,000 during 1956. The living quarters which were provided for the owner/operator of the San Dee Motel included a large living room, dining room, kitchen, master bedroom with bath, another bedroom with bath, a full basement, a basement bedroom, and a bathroom for a total square footage of 1,835. This 1,835 square feet was approximately 19.8 percent of the total motel square footage of 9.268. Petitioners remained in the motel until sometime in 1957. In September 1957 they moved into a house they had constructed on a lot in Boise, Idaho, which they had purchased in April of 1957. After 1956 no further payment on the $155,000 purchase price of the *56 motel was made and subsequently the seller repossessed the motel. Compressed Products Corporation Stock Petitioners own 63,300 shares of stock of the Compressed Products Corporation, a Nevada corporation (hereinafter referred to as Compressed). Petitioner began investing in this stock sometime in the early 1950's and had purchased a total of 21,100 shares of stock at $1 par value prior to a reorganization of the company. At the time of the reorganization the stock was split three for one giving petitioners 63,300 shares of stock with a basis of $21,100. On May 31, 1955, Compressed filed a petition in the United States District Court for the District of Nevada, Las Vegas, Nevada, for reorganization under chapter 10 of the Bankruptcy Act. After several years of procedure in the Bankruptcy Court, a second plan of reorganization was submitted to the Court. This second plan was approved by the Court on November 10, 1960. At the time Compressed filed its petition in the United States District Court, its only assets were its royalty agreement with the Delicate Corporation of America 1288and certain patents, trademarks, and associated rights relating to the manufacture of a sanitary *57 napkin and machinery for the manufacturing process. Over $445,000 of creditors' claims were filed against the debtor corportion in years subsequent to the filing of the petition for reorganization. Approximately one-half of the claims were disallowed and additional claims were compromised at approximately 10 cents on the dollar. Debtor claims by persons connected with the ownership or management of the corporation were reduced from $65,702.52 to $41,833.89. Preferred stock was issued in settlement of these claims. Sometime in 1955 after the petition was filed on May 31, 1955, the patents, trademarks, associated rights, and machinery were licensed to American Hygienic Corporation who advanced a sum in excess of $100,000 to Compressed to allow it to pay its creditors as proposed in the second plan of reorganization. Once the plan of reorganization was approved, Compressed ceased to be an operating corporation. All its machinery, equipment, patents, trademarks, and associated rights were used by American Hygienic Corporation under the terms of its license agreement. Since 1955 Compressed has had no income or expense other than the royalty payments hereinafter described and the payment *58 of an annual license fee to the State of Nevada to keep the corporation alive. No income statements or balance sheets have been prepared and no meetings of stockholders or officers have been held. Since 1955 American Hygienic Corporation has used the patents, trademarks, and associated rights of Compressed and has paid a royalty in accordance with the terms of its agreement of between $3,000 and $3,500 per year. This royalty is then applied against the $110,000 advance made by American Hygienic Corporation and the funds are retained by American Hygienic Corporation. At the present time the outstanding balance due on the advance from American Hygienic Corporation is approximately $67,000. It is estimated that at the rate of return experienced since 1955 it will be another 20 years before the royalties to American Hygienic Corporation retire the advance made by that corporation. At that time the funds can then be applied to claims of the preferred stockholders and then the common shareholders. There has been no market whatsoever for the sale of Compressed's stock since 1955, nor have there been any known sales of this stock. Blind Bull Coal Company Stock Sometime in the 1930's *59 petitioners began acquiring stock in the Blind Bull Coal Company (hereinafter referred to as Blind Bull) which operated a coal mine in Wyoming about 12 miles southeast of petitioners' Alpine property. The Blind Bull mine contains approximately 20 million tons of coal and is one of the highest, if not the highest, coal mine in the United States. Because of its elevation, difficulties have been experienced in mining and transportation of coal during much of each year because of the weather conditions. Petitioners along with other shareholders purchased stock yearly to make improvements and to keep the mine going. By 1944 petitioners had acquired a large portion but not a majority of the outstanding 197,002 shares of capital stock. The stock had a par value of $1. In 1944 petitioner purchased stock from Frank Merrill. The purchase price for the stock was paid in part by $9,000 to $10,000 in cash in 1944. The balance was paid from funds obtained by petitioner on two notes to the Largilliere Company Bank which he executed in May 1945, one in the amount of $7,500 for 6 months and the other in the amount of $13,500 for 4 months. After petitioners' purchase of stock from Frank Merrill, he *60 had 101,198 shares in his name, some of which belonged to his children. In 1950 petitioner sold his Blind Bull stock to the IdahoCoal Mining Company which was controlled by J.B. Williamson. By the terms of the agreement of purchase and sale dated July 20, 1950, the sales price of the stock was to be $71,850.58 payable $10,000 at the time of delivery and the balance in installments beginning September 28, 1950, the amount of the payments to be based on the tons of coal that were mined. The agreement provided that in the event of payments of the principal or interest being delinquent and remaining delinquent for 30 days the seller, after notice in writing to the buyer, should have the right to all voting powers and voting rights of the capital stock until such delinquent payments were made to the seller. The buyer covenanted not to commit waste of the property and to conduct the business in an efficient, competent, and businesslike manner, keeping full and accurate books of account and furnishing the seller with a 1289 copy of the annual audit of such books. The buyer also convenanted to pay all taxes when due and to operate the mine in its usual and customary mining operation *61 similar in character to previous operations and that no capital stock in the treasury should be sold for less than par value. The stock certificates were held in escrow by the Idaho Bank of Commerce. The stock remained in the name of the seller and upon default of the buyer was to be returned to the seller. Petitioners did not report their sale of the Blind Bull stock on their 1950 income tax return. An additional tax for the year 1950 was assessed against and paid by petitioners on the basis of an audit by an agent of respondent who considered petitioners' basis in the Blind Bull stock to be $30,000. Shortly after the $10,000 initial payment on the Blind Bull stock, Williamson came to petitioner seeking to borrow money to apply on the purchase of a grader. In order to keep the mine operating so as to insure payment by Williamson on the contract of sale of the Blind Bull stock, petitioner loaned the IdahoCoal Mining Company $7,055.67 on a 3-month note at 6 percent interest. Petitioner prior to 1954 had cosigned a $5,000 note payable to the Idaho First National Bank as guarantor for IdahoCoal Mining Company and Blind Bull. In September 1955 the bank called upon the guarantors *62 to make good the note and petitioner paid $3,000 to the bank and cosigned a renewal note in the amount of $2,000. Petitioner and his attorney went to the mine several times to check on production. Each time Williamson was gone and the mine was not operating according to the agreement. In 1954 petitioners regained the stock held in escrow because of Williamson's default on the terms of the contract. Williamson absconded with all of the corporation's files, records, and stockbooks. During the period from 1950 through 1954 when Williamson had control of Blind Bull much of the personal property of the company in the form of equipment and furniture was mortgaged, sold, or otherwise disposed of. Taxes were not paid during this period of time and royalty payments due to the Government were either not paid or were only partially paid. The mining lease was in jeopardy. The minutes of the board of directors meeting dated September 29, 1954, stated in part: Mr. Merrill stated that after an extensive investigation arising from trips to Salt Lake City, Utah; Cheyenne, Kemmer and Evanston, Wyoming, Rexburg, Idaho and to the Blind Bull Coal Company mine, it was apparant that practically all *63 personal property of the company had been mortgaged, sold and or otherwise disposed of. Also, payments to the government on account of Social Security and other taxes had not been settled. Royalty payments were past due and many other obligations contracted for by Williamson in his apparent involved entity operations were unpaid. Also, that the lease with the government was in jeopardy by reason of unpaid coal royalty. Mr. Merrill was advised by government officials that coal to a value of approximately $125,000.00 had been disposed of without any accounting to the government. Mr. Merrill stated that the present directors were obligated to do any and all things necessary to protect the interest of minority stockholders of the company. After some discussion of the problems of the company as outlined by attorney Merrill, it was duly moved seconded and approved that President Ruud, with legal assistance of our attorney be empowered to take any action necessary to safeguard the investment of the stockholders and remaining assets of the company. * * * As the company had no funds of any nature it was evident that arrangements would be necessary to meet accruing bills. The Directors *64 present decided that any stockholder, who at any time, advanced funds to the company to meet current bills, should be refunded such amounts from any funds that may later become available, together, with 6% interest. A representative from Blind Bull met with government officials in an attempt to make satisfactory arrangements for the back royalty payments due from 1950 to 1954. In 1955 the royalty payments were compromised by Blind Bull paying $1,090.40 instead of the approximately $5,000 originally due the Government. In December 1955 Ruud loaned to Blind Bull $3,000 at 6 percent interest to enable it to meet pressing obligations. Blind Bull repaid $1,500 of this loan in December 1956 and the remaining $1,500 in June 1957. Suit was filed by Blind Bull against the Idaho Bank of Commerce, IdahoCoal Mining Company, Gray River Coal Company, and their officers in the District Court of the Ninth Judicial District for the County of Bonneville, State of Idaho. 1290 The third amended complaint dated April 6, 1957, alleges that Blind Bull was defrauded by chattel mortgages being placed on its personal property and the sale of its equipment as well as stored coal. Damages asked *65 for were: 1. For depletion of assets
$48,086.74
2. Obligations wrongfully incurred
20,448.01
3. Stored coal converted 9,000.00
Total
$77,534.75 The suit was lost sometime later in 1957. In October 1957 Lincoln County sold all the personal property in the form of equipment and machinery which Blind Bull still held for taxes owed the County. The Blind Bull bank account was finally closed on June 1, 1958, and the corporation ceased to conduct any business whatsoever after that date. The corporate charter was forfeited for nonpayment of license fees on November 30, 1960. The following schedule shows the receipts and disbursement of Blind Bull for the period October 9, 1954, through June 1, 1958: *90 Receipts
Disbursements
Date
Item
Amount
Date
Item
Amount
10-11-54
Bank note
$ 2,000.00
10-9-54
Capital stock tax--Wyoming
$ 25.00
11-30-54
By transfer of old
10-9-54
Capital stock tax--Idaho
62.50
First Security Bank
10-9-54
Lincoln County Recorder--legal
account
34.23
record
28.00
10-9-54
Fred Ring & Assoc.--minute book
5.75
10-9-54
A. A. Merrill--legal
1,000.00
11-4-54
Capital stock tax--Wyoming
25.00
12-1-54
A. A. Merrill--travel expenses
275.00
10-30-55
Bert Ruud--advance
3,000.00
5-13-55
Fred Ring & Assoc.--office
services
125.00
6-1-55
Idaho First National Bank--
notes and interest
56.67
6-15-55
Capital stock tax--Idaho
100.00
6-15-55
Capital stock tax--Wyoming
25.00
12-29-55
Idaho First National Bank--note
and interest
2,091.66
12-29-55
Dept. of Interior--lease bal.
1,090.40
8-30-56
Coal royalty--Joe Goyen
76.30
1-4-56
L. H. Merrill--legal expense
35.00
9-15-56
Coal royalty--Joe Goyen
227.10
1-5-56
Tandy & Wood--bond premium
50.00
10-10-56
Coal royalty--Joe Goyen
963.33
9-27-56
Capital stock tax and penalty--
11-6-56
Interest on C.D.
100.00
Idaho
110.00
11-14-56
Coal royalty--Joe Goyen
499.68
12-14-56
Bert Ruud--to apply on note
1,500.00
12-13-56
Coal royalty--Joe Goyen
663.45
12-15-56
Fred Ring & Assoc.--office
1-6-57
Bond deposit retorned
services
250.00
$2,500. Interest $100
2,600.00
5-16-57
Capital stock tax--Idaho
100.00
5-16-57
Capital stock tax--Wyoming
50.00
6-6-57
Tandy & Wood--bond premium
27.25
9-10-57
A. A. Merrill--%filing fee for suit
200.00
9-10-57
A.A.Merrill--Filing fee for suit
200.00
5-23-58
Tandy & Wood--C.D. Int.
75.00
3-31-58
L.H. Merrill--Deposition fee
100.00
4-2-58
Court reporter
32.10
4-28-58
Witness fee
15.00
4-28-58
Witness fee
28.00
5-23-58
Fred Ring & Assoc.--office
services 242.00
Total $10,239.09
Total $9,876.67
*66 1291 The following tables show the balance sheets and profit and loss statements of Blind Bull for the years 1944 to 1949 and 1953 to 1957: *90 Balance Sheet *90 1944-1949
1944
1945
1946
1947
1948
1949
Assets
Current assets
Cash
$ 9,509.43
$ 6,966.51
$ 10,222.56
$ 7,223.13
$ 1,704.28
$ 349.31
Investments and Cert. of dep.
11,885.24
18,385.24
18,385.24
18,385.24
19,842.82
20,056.24
Accounts receivable 406.63
11,864.64
Total current assets
$ 21,801.30
$ 37,216.39
$ 28,607.80
$ 25,608.37
$ 21,547.10
$ 20,405.55
Fixed assets
Office equipment
31.67
350.97
327.28
303.59
279.90
256.21
Mine equipment
18,836.73
13,740.73
20,105.52
17,918.91
22,218.61
22,179.64
Road construction
15,349.20
14,960.48
14,571.76
14,183.04
13,794.32
13,405.60
Miscellaneous 2,470.98
11.67
1,536.32
1,899.94
1,543.87
Total fixed assets
$ 36,688.58
$ 29,063.85
$ 35,004.56
$ 33,941.86
$ 38,192.77
$ 37,385.32
Intangible assets
Mine lease permit
150,000.00
150,000.00
150,000.00
150,000.00
150,000.00
150,000.00
Less depletion 10,481.92
10,503.62
10,703.62
10,623.88
10,698.56
10,698.56
Total intangible assets $139,518.08
$139,496.38
$139,296.38
$139,376.12
$139,301.44
$139,301.44
Total assets $215,880.98
$205,776.62
$202,908.74
$198,926.35
$199,041.31
$196,992.31
Liabilities
Accounts payable
$ 729.02
$ 1,191.16
$ 493.40
$ 232.32
$ 232.32
Notes, bonds, etc.payable
Hospital fee--reserve 535.99
535.99
535.99
535.99
535.99
535.99
Total liabilites
$ 1,265.01
$ 1,727.15
$ 1,029.39
$ 1,029.39
$ 768.31
$ 768.31
Capital account
197,002.00
197,002.00
197,002.00
197,002.00
197,002.00
197,002.00
Earned surplus 17,613.97
7,047.47
4,877.35
894.96
1,271.00
(778.00)
Total capital accounts $214,615.97
$204,049.47
$201,879.35
$197,896.96
$198,273.00
$196,224.00
Total capital and liabilities $215,880.98
$205,776.62
$202,908.74
$198,926.35
$199,041.31
$196,992.31
*67 1292 *90 Balance Sheet *90 1953-1957
1953
1954
1955
1956
1957
Assets
Current assets
Cash
$ 105.23
$ 792.00
$ 303.27
$ 888.13
$ 883.54
Investments and Cert. of dep.
Accounts receivable
Total current assets
$ 105.23
$ 792.00
$ 303.27
$ 888.13
$ 883.54
Fixed assets
Office equipment
161.45
139.64
119.77
105.39
Road construction
17,723.22
17,064.50
16,405.78
15,747.06
15,088.
Road construction
17,723.22
17,064.50
16,405.78
15,747.06
15,088.34
Miscellaneous 573.33
314.12
174.50
Total fixed assets
$ 35,358.77
$ 33,416.64
$ 31,885.53
$ 30,390.13
$ 15,088.34
Intangible assets
Mine lease permit
[1] 192,490.56
[1] 195,745.92
[1] 199,277.51
[1] 198,88.05
[1] 211,982.68
Less depletion 10,798.56
10,798.56
10,798.56
10,798.56
10,798.56
Total intangible assets $181,692.00
$184,947.36
$188,478.95
$187,889.49
$201,184.12
Total assets $217,156.00
$219,156.00
$220,667.75
$219,167.75
$217,156.00
Liabilities
Accounts payable
$ 11,448.01
$ 11,448.01
$ 11,448.01
$ 11,448.01
$ 11,448.01 11,448.01
Notes, bonds, etc., payable
9,000.00
11,000.00
12,511.75
11,011.75
9,000.00
Hospital fee--reserve 535.99
535.99
535.99
535.99
535.99
Total liabilities
$ 20,984.00
$ 22,984.00
$ 24,495.75
$ 22,995.75
$ 20,984.00
Capital account
197,002.00
197,002.00
197,002.00
197,002.00
197,002.00
Earned surplus (830.00)
(830.00)
(830.00)
(830.00)
(830.00)
Total capital accounts $196,172.00
$196,172.00
$196,172.00
$196,172.00
$196,172.00
Total capital and liabilities
$217,156.00
$219,156.00
$220,667.75
$219,167.76
$217,156.00
*68 1293 *90 Profit and Loss Statement *90 1944-1949
1944
1945
1946
1947
1948
1949
Income:
Mine lease and coal
$17,090.42
$ 1,928.00
$4,952.69
$ 7,865.00
$9,070.90
$6,764.17
Yard--coal
10,870.22
17.50
Sale of assets
7,545.33
13,336.41
669.11
Interest
50.11
194.55
95.86
507.58
325.92
Miscellaneous--
Income adjustment
319.34
Total income $35,825.31
$15,332.02
$5,147.24
$ 8,629.97
$9,578.48
$7,090.09
Expenses:
Advertisement
61.92
136.61
9.60
Audit and legal expenses
175.00
250.00
273.10
75.00
75.00
Capital stock tax
77.50
77.50
77.50
77.50
77.50
77.50
Car and truck expenses
2,482.98
356.39
326.17
Depreciation
3,994.23
2,518.97
1,833.29
2,764.47
3,095.59
3,293.45
General expense
1,896.93
889.12
Hauling and yard labor
1,398.43
6.18
327.90
Insurance
344.29
165.45
197.51
97.25
97.98
Interest and bond
263.05
50.00
50.00
50.00
Lease expense
216.30
64.50
Mine depletion
54.32
21.70
200.00
66.38
74.68
100.00
Mine labor
12,900.87
150.00
Mine supplies
1,486.16
400.00
488.52
Mine expense
584.50
1,236.99
1,000.47
357.14
244.28
Office expense
2,274.52
59.75
55.70
92.19
148.51
164.77
Oil, gas and supplies
1,371.38
272.78
158.80
311.10
Other taxes: except income
1,991.84
483.24
175.84
33.00
Road expense
175.00
644.76
Royalty on coal
782.04
268.50
5,000.00
1,106.00
867.75
Salary--manager
2,400.00
2,400.00
2,400.00
3,300.00
3,600.00
3,600.00
Travel expense 186.31
207.98
109.30
186.00
Total expenses $34,726.27
$ 9,403.38
$7,509.94
$12,513.61
$9,202.44
$9,139.09
Net profit or (loss) $ 1,099.04
$ 5,928.64
($2,362.70)
($3,883.64)
$ 376.04
($2,049.00)
*69 1294 *90 Profit and Loss Statement *90 1953-1957
1953
1954
1955
1956
1957
Income:
Mine lease and coal
$ 986.60
$2,429.86
Yard--coal
Sale of assets
300.00
($14,643.07)
Interest
--
--
--
50.00
100.00
Miscellaneous--
Income adjustment
$ 118.02
2,500.00
Total income $ 1,286.60
$ 118.02
$2,479.86
($12,043.07)
Expenses:
Advertisement
Audit and legal expenses
$1,275.00
$ 511.75
$ 35.00
$ 200.00
Capital stock tax
52.50
112.50
125.00
110.00
150.00
Car and truck expenses
Depreciation
5,571.04
1,942.13
1,531.11
1,495.40
658.72
General expense
27.25
Hauling and yard labor
Insurance
Interest and bond
491.36
148.33
215.59
Lease expense
1,090.40
Mine depletion
Mine labor
Mine supplies
5,200.00
Mine expense
Office expense
273.15
43.75
125.00
250.00
Oil, gas, and supplies
Other taxes:
except income
2,300.00
Road expense
Royalty on coal
3,708.18
Salary--manager
Travel expense
Total expenses $17,596.23
$3,373.38
$3,531.59
$1,890.40
$1,251.56
Net profit or (loss)
($16,309.63)
($3,255.36)
($3,531.59)
$ 589.46
($13,294.63) 1295 In each *70 of the years 1955, 1956, and 1959 petitioners failed to report some of their interest income. In each of the years 1958 and 1959 petitioners failed to report some of their partnership income. In 1956 petitioners failed to report their profit from operation of the San Dee Motel. In 1955 petitioners failed to report gain from the sale of creamery certificates and certain unidentified income. Respondent in his notice of deficiency determined petitioners' income in each of the years here in issue by increasing reported income by those items which petitioners failed to report. In addition, respondent determined that petitioners had a capital gain of $66,987.75 in 1955 from the condemnation of their farm and disallowed the capital losses claimed by petitioners on their return for the year 1955 for worthlessness of petitioners' stock in Compressed and Blind Bull and for debts resulting from a loan to IdahoCoal Mining Company and payment on a note as guarantor for that company and Blind Bull. By affirmative allegation in his answer respondent claimed an increased deficiency based on a capital gain to petitioners from the payment received by them from the government in 1956 with respect *71 to the condemnation of their farm. Ultimate Findings of Fact 1. Petitioners paid $65,000 for the home ranch land and this was the amount of their basis in that land in 1955 when the property was condemned. 2. Petitioners paid $6,980 for the land known as the Alpine property and this amount was their basis in that land when the property was condemned in 1955. 3. The cost of the San Dee Motel to petitioners was the contract price of $155,000 and this is the amount to be used in determining the cost of their residence in the motel which was purchased to replace their home on the home ranch property which was condemned. 4. Petitioners' Compressed stock became wholly worthless in 1955. 5. Petitioners' Blind Bull stock did not become wholly worthless in either 1954 or 1955. 6. The debt owed petitioner by Blind Bull, because of petitioner's payment as guarantor of its note, did not become worthless in either 1954 or 1955 and the debt owed petitioner by the IdahoCoal Mining Company did not become worthless in either of these years. 7. Petitioners' failure to keep proper records and to accurately report their taxable income in each of the years in issue was due to negligence *72 or intentional disregard of rules and regulations. Opinion Gain on Condemnation In order to determine the amount of gain, if any, which petitioners realized from the condemnation of their home ranch and Alpine properties and the amount of such gain, if any, which is to be recognized, two questions of fact must be resolved. The first is the amount of petitioners' bases in these properties and the second is the cost to petitioners of qualifying replacement properties. The deed transferring the home ranch property to petitioner does not show the price petitioner paid for the property and it is necessary to determine this fact from other evidence. The evidence shows that petitioner drew five checks to George Keyser in the amounts of $15,000, $5,000, $20,000, $7,040.80, and 27,247.30 which bore notations to the effect that they were in payment on the "contract." However, the "contract" for the sale of the ranch was not produced since it had apparently been destroyed in a fire. Petitioner recalled that he did obtain some machinery and horses in addition to the land and that the cost of the land was "over $65,000." George Keyser had acquired the property which he sold to petitioners *73 in 1918 in several transactions beginning 4 years prior to the sale to petitioners. These acquisitions began in 1914 and ended in 1915. One tract was purchased on July 31, 1914, from a partnership of S.F. Groves and Son for the sum of $13,000. Another tract was conveyed to Keyser on December 14, 1914, by William H. and Myrtle E. Cary for the sum of $2,150. A third tract was conveyed to George Keyser by Charles and Irene Fleming on August 2, 1915, for the sum of $1,500. Respondent argues that it is unreasonable to assume that land for which Keyser paid $16,650 would be sold to petitioners 3 or 4 years later for over $20,000 and that any amount in excess of $20,000 paid by petitioner to Keyser must have been for cattle or other property. However, we are persuaded by the evidence that petitioners paid at least $65,000 for the land comprising the 1296 home ranch and have so found. Between 1915 and late 1917 when petitioner completed arrangements to purchase the home ranch property there had been an increase in land prices due to the entrance of this country into World War I. Also, the quantity of land sold to Keyser to petitioners was sufficiently large to obtain a type of permit *74 for grazing cattle on government forest lands which could not be obtained by an owner of substantially smaller parcels of land. Therefore, the parcel comprising the home ranch was more valuable per acre than the smaller parcels of which it was comprised because the owner of this larger quantity of land was able to obtain a grazing permit for government forest lands. Respondent urges that since the total price 4 years prior to the sale to petitioners was only $16,650 and the stamp tax paid upon the recording of petitioners' deed was $20 indicating a purchase price of $20,000, we should determine the purchase price to be $20,000. Petitioners adequately explained the fact that only $20 worth of stamps were placed on the deed when it was recorded and on the basis of all this evidence including the evidence showing purchases by petitioner of cattle from other sources, we have concluded that the cost to petitioners of the home ranch land was $65,000. Petitioners urge that a letter dated June 13, 1919, from the Largilliere Company Bank regarding a $21,000 loan shows a payment toward the contract for the purchase of the home ranch in addition to the $74,288.10 paid by checks. However, *75 we find that the evidence indicates that the $21,000 loan was used for one of the payments represented by the checks comprising the $74,288.10. The amount paid for the Alpine property is a purely factual issue. Our finding that the various payments for this land total $6,980 disposes of this issue. Therefore, we conclude that the total cost to petitioner of the land condemned was $71,980, which when added to the basis for miscellaneous improvements of $29,700 to which the parties agree and the $7,912 agreed basis of the granaries, results in a basis of $109,592 exclusive of the agreed basis of $7,500 for the Alpine hotel and the agreed basis of $15,000 for the house on the home ranch on which petitioners contend no gain is recognizable. The parties have stipulated that $15,155 of the $152,250 which they agree petitioners constructively received in 1955 for their condemned property is allocable to the Alpine hotel and $28,795 of this amount is allocable to petitioners' home on the home ranch property. The parties also agree that $1,834 of the net receipts of condemnation proceeds in 1956 is allocable to the Alpine hotel and $3,484 of such net receipts is allocable to petitioners' *76 home on the home ranch property. Respondent now concedes that the San Dee Motel was property similar to the Alpine hotel property and that no gain is recognizable from the condemnation of the Alpine hotel. Section 1033[5] governs treatment of involuntarily converted property which, of course, includes property condemned by the government for purposes of public domain. Respondent on brief conceded that to the extent the receipts allocable to the 1297 house on the home ranch were reinvested in the residence in the motel, the gain on the condemnation of the home is not to be recognized under section 1033. However, respondent argues that petitioner's total investment in the San Dee Motel was $36,000 and that 19.8 percent of such amount is all that is allocable to the portion of the motel used by petitioners as a home. *77 Petitioners in 1956 entered into a contract to purchase the San Dee Motel for $155,000. However, they defaulted on the contract at the end of the year having paid only $36,000 of the contract price. Petitioners maintain that the contract price of $155,000 for the purchase of the motel is the amount invested for the purpose of computing the cost of the residence portion of the motel which was replacement property for their home under section 1033. [6] Petitioner would therefore consider 19.8 percent of $155,000 as the cost of the replacement property. We agree with petitioner that the cost of the San Dee Motel was $155,000. *78 The parties stipulated that petitioners "agreed to buy the San Dee Motel for $155,000.00 and made total payments thereon of $36,000.00 during 1956 within the required time limitations for like-kind reinvestments." The amount petitioners agreed to pay for the property is its purchase price. See William B. Cusack, 48 T.C. 156 (1967) which holds replacement property to have been purchased even though no payment was made except a small downpayment and the property was reconveyed to the seller the year following its purchase pursuant to a provision permitting such reconveyance if certain conditions were not complied with. Therefore 19.8 percent of $155,000 or $30,690 is the cost allocable to the new residence petitioners acquired to replace their home for which they received $28,795 in a condemnation award in 1955 and $3,484 in 1956. Since we do not have the year 1957 before us, it is not necessary for us to determine what adjustment, if any, is required to be made in that year because of petitioner's default with respect to all but $36,000 of the $155,000 purchase price of the San Dee Motel. Worthlessness of Compressed Products Corporation Stock The second issue is *79 whether petitioner's stock in Compressed became worthless in 1955 so as to be deductible as a capital loss in that year under section 165(g). [7] A loss from worthless stock is deductible only in the year in which the stock becomes worthless. The facts here clearly show some value of the Compressed stock at the end of 1954 and neither party contends that this stock did not have value at the beginning of 1955. Petitioner says the stock had no value after 1955 because the claims of its creditors filed and allowed in the reorganization proceeding filed on May 31, 1955, exceeded any possible amount the company might hope to receive as royalties for the licensing of all its assets. The license agreement had been entered into in 1955 and an advance of $110,000 was received from the licensee to pay claims of creditors. Since in 1955 the liabilities of Compressed exceeded *80 the value of its assets, the stock had no liquidating value. However, 1298 even though a corporation's assets are less than its liabilities, if there is reasonable hope or expectation that its assets will exceed its liabilities sometime in the future, its stock, while having no liquidating value, has a potential value and is not worthless. Joseph C. Lincoln, 24 T.C. 669 (1955), affd. 242 F. 2d 748 (C.A. 6, 1957). Usually when the stock of a corporation becomes worthless there is some "identifiable event" in the corporation's life which puts an end to any expectation that the corporate assets will exceed its liabilities. In some cases the liabilities so far exceed the assets that this fact, itself, shows the stock to be worthless. In Sterling Morton, 38 B.T.A. 1270, 1279 (1938), affd. 112 F. 2d. 320 (C.A. 7, 1940), we stated in this respect: There are, however, exceptional cases where the liabilities of a corporation are so greatly in excess of its assets and the nature of its assets and business is such that there is no reasonable *81 hope and expectation that a continuation of the business will result in any profit to its stockholders. In such cases the stock, obviously, has no liquidating value, and since the limits of the corporation's future are fixed, the stock, likewise, can presently be said to have no potential value. Where both these factors are established, the occurrence in a later year of an "identifiable event" in the corporation's life, such as liquidation or receivership, will not, therefore, determine the worthlessness of the stock for already "its value had become finally extinct." * * * In our view the Compressed stock had ceased to have any value in 1955 whether or not the filing of the reorganization petition was an identifiable event putting an end to value of the stock. See Charles W. Steadman, 50 T.C. 369, 376 (1968), on appeal (Jan. 3, 1969, C.A. 6), and cases there cited. On May 31, 1955, when Compressed filed a petition for reorganization, its only assets were its royalty agreements with Delicate Corporation of America and certain patents, trademarks and associated rights relating to the manufacture of a sanitary napkin and machinery for the manufacturing process. The patents, *82 trademarks, and associated rights and machinery were licensed to American Hygienic Corporation which advanced a sum in excess of $110,000 to Compressed to allow it to pay its creditors. Beginning in 1955 Compressed ceased to be an operating corporation and since that time has had no income other than the royalty receipts which are applied as payments against the advance and no expenses except payments of annual license fees to the State of Nevada to keep the corporation alive. After 1955 no income statements nor balance sheets have been prepared and no meetings of the stockholders of officers have been held. At the time of trial the outstanding balance on the advance to American Hygienic Corporation was approximately $67,000. It is estimated that at the rate of return experienced since 1955 it will be another 20 years before the royalties from American Hygienic Corporation will retire the advance made to Compressed by that corporation. At that time the funds will be applied to the claims of the preferred stockholders. However, Compressed's patents will expire prior to the time its advance from American Hygienic Corporation is repaid if the rate of return from the royalties does not *83 substantially increase. Petitioner contends that the filing of the petition for reorganization, cessation of business, and transfer of all its assets to American Hygienic Corporation constituted "identifiable" events causing the Compressed stock to become worthless in 1955. Respondent contends that Compressed's stock did not become valueless until 1960 when its second plan of reorganization was finally approved. In view of the circumstances of Compressed in 1955 we conclude that its stock was valueless in that year even though its reorganization plan was not finally approved until 1960. In determining when stock becomes worthless the Code does not require the shareholders to be "incorrigible optimists." United States v. S.S. White Dental Mfg. Co., 274 U.S. 398 (1927). We hold that petitioners are entitled to a deduction in 1955 of a long-term capital loss in the amount of $21,100 because their stock in Compressed became worthless in that year. Worthlessness of Loans to and Stock of Blind Bull Coal Company The principles of law we discussed in connection with the issue concerning the worthlessness of the Compressed stock are applicable to the determination of *84 whether the stock of Blind Bull became worthless in 1954 or 1955. However, the financial circumstances of Blind Bull in 1954 and 1955 differ materially from the 1299 financial circumstances of Compressed in 1955. Although petitioners contend that Blind Bull was insolvent in 1954 and 1955, the evidence in this case does not support their contention. Petitioners argue that because much of the personal property of Blind Bull had been mortgaged, sold, or otherwise disposed of in 1954 and 1955 and payments for social security taxes and mine royalties were past due, the company was insolvent. However, the financial position of Blind Bull at the end of 1955 does not indicate insolvency. We have made adjustments to the balance sheet of Blind Bull as shown in its Federal income tax returns in all instances where the evidence as a whole indicates the adjustments to be necessary to show a fair picture of the company's financial situation. Mine equipment which is shown at $15,185.48 in the balance sheet has been reduced to $994.28 to adjust for an Austin-Western speeder which the evidence shows was sold by the Idaho Bank of Commerce in April 1954. The basis of the mine lease was shown on *85 the books at $150,000 until Williamson took over the company in 1950. In 1953 the mine lease was shown on the books at $192,490.56 because of charging losses of the company as development costs added to the mine lease account. In 1955 such charges had increased the basis of the mine lease on the company's books to $199,277.51. In 1945 respondent's agents in an audit of Blind Bull determined the value of the mine permit to be $27,000 based on actual cost less depreciation allowed of $2,213.64. Using the actual cost as determined in 1945 by respondent's agents less depreciation allowable as of 1955, the value of the mine lease would be $24,491.42 instead of the $188,478.95 as shown on the books. Based on the balance sheet shown on the income tax return for 1955 with the adjustments heretofore discussed, an evaluation of the assets and liabilities of Blind Bull at the end of 1955 is as follows: Assets
Cash
$ 303.27
Office equipment
119.77
Mine equipment
994.28
Road construction
16,405.78
Miscellaneous 174.50
Total
$17,997.60
Mine lease
$27,000.00
Less depletion 2,508.58 24,491.42
Total assets
$42,489.02
Liabilities
Accounts payable
$11,448.01
Notes, bonds, etc. payable
12,511.75
Hospital fee-reserve 535.99
Total liabilities 24,495.75
Assets in excess of liabilities $17,993.27
*86 Although as of the end of 1955 Blind Bull did not have sufficient liquid assets to meet its obligations, and in this sense of the word "insolvency" it was insolvent, its assets adjusted as best the evidence enables us to make adjustments, exceeded its liabilities by approximately $18,000. This fact indicates that the stock of the company was not worthless as of the end of 1955. See Commissioner v. Bachrach, 182 F. 2d 261, 264 (C.A. 7, 1950), affirming a Memorandum Opinion of this Court. If the assets shown on the balance sheet had less value than stated or if the liabilities were greater than stated, it was the petitioners' burden to show these facts. Boehm v. Commissioner, 326 U.S. 287 (1946). No such evidence is contained in the record. The record also contains other evidence indicating the Blind Bull stock did not become worthless in 1955 or before. In 1956 Joe Goyen under an arrangement with Blind Bull mined coal from the mine paying a certain amount for each ton of coal extracted. Blind Bull had income from this source in the amount of $2,429.86 giving *87 a profit for the year 1956 of $589.46. Continuation of a corporation in business 1300 frequently indicates continuation of worth of the corporate stock. Joseph C. Lincoln, supra. In April 1957 Blind Bull filed a suit against IdahoCoal Mining Company, Idaho Bank of Commerce, and the officers of these companies claiming the amount of $77,534.75. There is no evidence in the record to indicate that Blind Bull did not have some expectation of recovery when it instigated the suit. The suit was not concluded adverse to Blind Bull until the latter part of 1957 and it was not until the conclusion of the suit that Lincoln County sold most of Blind Bull's machinery to obtain payment of overdue taxes. The pendency of the suit is some indication that the Blind Bull stock did not become worthless in 1955 or prior thereto. Cf. Boehm v. Commissioner, supra. Blind Bull's lease was of one of the finest soft coal mines in the United States but because of the location of the mine, it was difficult to operate successfully. The lease was, in itself, the principal asset of Blind Bull and was the asset which originally induced the shareholders to invest in the company. *88 Under these circumstances as long as Blind Bull retained its lease there was some potential value to its stock. Since we have concluded that the stock of Blind Bull did not become worthless in 1955 or prior thereto, it is not necessary to deterimne the basis of such stock held by petitioners. For the same reason we have concluded that the stock of Blind Bull did not become worthless in 1955, we conclude that the debt to petitioner by Blind Bull which arose from his payment of $3,000 as a guarantor on the corporation's notes did not become worthless in that year. The $7,055.67 loan which petitioners claim became worthless in 1955 appears from the evidence to have been a loan to IdahoCoal Mining Company. If the loan was made to that company, there is no evidence in the record to support petitioners' contention that the debt was uncollectible in 1955 or prior thereto. If the loan was to Blind Bull, we conclude that petitioners have failed to establish its worthlessness in 1955 or prior thereto for the same reason that we held the stock of Blind Bull not to have become worthless in 1955 or prior thereto. Profit from Operation of San Dee Motel Petitioners alleged error in respondent's *89 determination of their profit in 1956 from the operation of the San Dee Motel. This issue was not one disposed of by agreement of the parties. However, petitioners offered no evidence in support of their allegation that respondent erred in his determination of such profit. We therefore sustain respondent's determination of petitioners' profit from the operation of the San Dee Motel because of petitioners' failure of proof. Additions to Tax Respondent determined additions to tax under section 6653(a)[8] for negligence or intentional disregard of rules and regulations. The burden of proof is upon petitioners to show error in this determination. Gaylord C. Peters, 51 T.C. 226, 232 (1968). *90 Some of the items adjusted by respondent in the statutory notice of deficiency for the years in issue were the result of differences of opinion between respondent and petitioners or a misunderstanding of fact or law on the part of petitioners. If these were the only omissions of income from petitioners' returns or the only erroneous deductions claimed, we would conclude that petitioners had shown that their underpayment of tax for the years in issue was not due to negligence or intentional disregard of rules or regulations. However, in all the years in issue petitioners omitted from income items which should have been included in income and offered no evidence of the reasons for such omissions. Section 6653(a) provides for the addition to tax if "any part" of any underpayment is due to negligence or intentional disregard of rules and regulations. We therefore hold that petitioners are liable for the additions to tax under section 6653(a) in each of the years here in issue. Decision will be entered under Rule 50. 1301 Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. The year 1957 is not before us as no deficiency for this year was determined by respondent. The parties have agreed that petitioners sustained a net operating loss in 1957 of $18,377.15, which is available for carryback purposes. Appropriate adjustment for this agreed net operating loss carryback can be made in the recomputation under Rule 50.↩
3. Petitioner will refer to Bert Ruud. Emma is a party to this suit because the Ruuds filed joint income tax returns.↩
4. The 20 cents difference in the award of December 15, 1955, and the check of January 14, 1956 is not explained in the record.↩
1. Internal Revenue Field Report dated December 20, 1945 carries value of mine permit at $27,000.00, less prior depletion allowances of $2,213.64 equals $24,786.36.↩
5. SEC. 1033. INVOLUNTARY CONVERSIONS. (a) General Rule. - If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsory or involuntarily converted - * * * (3) Conversion into money where disposition occurred after 1950. - Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph: (A) Nonrecognition of gain. - If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. For purposes of this paragraph - (i) no property or stock required before the disposition of the converted property shall be considered to have been acquired for the purpose of replacing such converted property unless held by the taxpayer on the date of such disposition; and (ii) the taxpayer shall be considered to have purchased property or stock only if, but for the provisions of subsection (c) of this section, the unadjusted basis of such property or stock would be its cost within the meaning of section 1012. (B) Period within which property must be replaced. - The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending - (i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or (ii) subject to such terms and conditions as may be specified by the Secretary or his delegate, at the close of such later date as the Secretary or his delegate may designate on application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. * * * (b) Residence of Taxpayer. - Subsection (a) shall not apply, in the case of property used by the taxpayer as his principal residence, if the destruction, theft, seizure, requisition, or condemnation of the residence, or the sale or exchange of such residence under threat or imminence thereof, occurred after December 31, 1950, and before January 1, 1954.↩
6. Petitioners erroneously based their contention on Sec. 1034. Sale or Exchange of Residence. However, subparagraph (3) of Sec. 1034 (i) Special Rule for Involuntary Conversions, plainly states that section 1033 applies in this case. Sec. 1034(i) Special Rule for Involuntary Conversions. - (1) In general. - For purposes of this section, the destruction, theft, seizure, requisition, or condemnation of property, or the sale or exchange of property under threat or imminence thereof - * * * (B) if occurring after December 31, 1953, shall not be treated as the sale of such property. * * * (3) Cross reference. - For treatment of residences involuntarily converted after December 31, 1953, see section 1033↩ (relating to involuntary conversions).
7. Sec. 165(g) Worthless Securities. - (1) General rule. - If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.↩
8. SEC. 6653. FAILURE TO PAY TAX (a) Negligence or Intentional Disregard of Rules and Regulations with Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩